Good morning ladies and gentlemen. Our first case for argument today is United States v. Michael Segal as well as the appeal of Joyce Segal. These are numbers 172842 and 173317. We'll be hearing first from Mr. Joyce. Yes, your honor. My name is Ed Joyce and together with Jennifer Doherty, we represent Mr. Segal. Mr. Segal was ordered to personally forfeit $15 million. This appeal relates to a settlement between Mr. Segal and the government where Mr. Segal agreed to forfeit certain of his property to the government to pay the $15 million forfeiture. The district court approved the settlement but made no factual findings in that the property to be forfeited was acquired or maintained in violation of the racketeering provisions of Segal's indictment. Also, the court made no factual findings as to the value of the assets or the ownership of the assets to be forfeited. Mr. Joyce, before we get into the merits of the appeal, could you explain why you think your appeal is timely and why you think the civil portion of Federal Rule of Appellate Procedure 4 applies here to forfeiture proceedings in a criminal RICO case? Because Mr. Segal was not challenging his conviction, his sentence, or the forfeiture, which were the criminal aspects. What's the best authority for treating a criminal RICO forfeiture matter as civil for purposes of appellate procedure? Two Seventh Circuit cases, U.S. v. Lee and U.S. v. APAMPA. Did you mean U.S. v. Lilly? I didn't cite that, but at least I haven't cited it here. But the cases point out that where you're seeking a return of property, which is what Segal was doing. Well, we've said that with respect to third parties, but not with respect to defendants. I read, I'm sure you're correct, but I read Lee and APALA as indicating or stating that where you were seeking a return of property, you got 60 days to appeal. And it's clear from the decision rendered by the district court that the district court knew Segal was looking for a return of property. The motion was inartfully labeled as a motion to amend, but in reality the court knew you were looking for a return of property. And that is in his July 12, 2017 opinion. I don't know that the court knew you were looking for a return of property. It looked like the court understood that it was not a motion to amend the underlying forfeiture order, but instead to amend the settlement agreement or forfeiture agreement. I think that could be correct, but citing from the court's opinion, quote, he, meaning Segal, believes that the government wrongfully forced him to negotiate for the return of assets that clearly belong to him personally and also undervalue many of his assets. In his view, the proper remedy is for the court to order the government to, quote, remit to him whatever amount of distributions and sales proceeds he has received in excess of $15 million. So I think the court understood we were looking for a return of property. It looked like you were looking for just a rescission of the whole settlement agreement. No, because the settlement agreement provided benefits to both the government and to Segal. Right. For example, it provided that the forfeiture had been met. $15 million had been paid. So we weren't seeking to amend it. To treat it, in essence, the settlement became the substitute for the payment of the $15 million, correct? The settlement was the vehicle through which the $15 million was paid to the government. But it was more than that. It was the agreement to resolve the forfeiture judgment against Mr. Segal. Correct. I agree with that. Before we go too much more into the substance, Mr. Joyce, I want to go back to the timeliness of this appeal and whether or not this is a final order for purposes of appealing. Why is this a final order that you can appeal here if there are still proceedings ongoing in the district court? Because we were appealing from the denial of a motion to return property to Segal. The court made a finding, entered an order. It was docketed. We asked the court to reconsider that order. He denied it. That order was docketed, and we appealed from that order. We appealed from both orders. And I understand procedurally what happened, but my question is a little bit different. Why is that a final order that you can appeal at this point? Why shouldn't you wait until everything is resolved in the district court rather than bringing piecemeal appeals before this court? Your Honor, there's nothing that I know of that isn't resolved in the district court except Mrs. Segal's attempt to intervene. There's nothing left before the district court to deal with. Is there any way we can tell that from the docket? I didn't look at the docket for that purpose, but as a matter of fact, I know that is true. This was the last pending motion that was dealt with and ruled on by the court, and we appealed from that motion in less than 60 days, which we believe was correct under Lee and Impala. So if there is jurisdiction and this appeal is timely, once we resolve it, it's your opinion that we're done. You're done below. If you resolve it in the way that returns Mr. Segal's property to him, yes. So if we rule in your favor, yes, but if we don't rule in your favor, no? Then what happens? Well, I mean, the order you enter, if you agree with us, could be with directions for the court to just tell the government to give him back the assets in excess of $15 million. What if we don't agree with you? Is it over in the district court? Knowing Mr. Segal, I think there's two other forums. There's the U.S. Supreme Court and the Hague. Is it over in the district court? Yes, it is. Could I take you back also on the time limits issue to the Lee case you're referring to? Yes, Your Honor. What is that case? I don't see it in your briefs. I believe it is in our brief. When I come back and reply, I'll tell you where. The citation to Lee is 659 Fed 3rd 619, 2011. It's a Seventh Circuit decision. Likewise, the second case I cited was also a Seventh Circuit decision. And the Lee case involved a turnover order, correct? It didn't involve forfeiture. I believe it involved a turnover order under the Victim Restitution Act. Correct. But the government was arguing that it was one of the core criminal elements and, therefore, he had to appeal within 14 days. And the court recognized, no, he's not attacking his conviction, his sentence, or the forfeiture. He just wants his money back. And that, according to Lee, citing Taylor, says, An order denying a motion for return of property has been deemed civil, citing Taylor, also a Seventh Circuit decision. As has, well, okay. And, again, as Judge Hambleton pointed out, that involved turnover to third parties, to the victims, correct? It did. It was a restitution issue. But I think, from my point of view, the significance was the court said, look, he's not attacking any of the core criminal issues here. He's not attacking his conviction, not attacking his sentence, not attacking the order of restitution. Well, he was, actually. But they concluded he was actually looking for a return of his property, which is what Segal is looking for. I have to say that it's a pretty high stakes gamble to assume that you can use the civil deadlines here without something much more specifically on point involving RICO forfeiture. I've given you in my briefs all I have. Okay. Well, I don't see Lee in your briefs. I'm sorry. Stand up. I'll try and take care of that. So can I continue? Please. All right. So I think it's significant that, in denying Segal's motion, the court didn't make any findings about, well, who owned these assets or what they were worth. What required the court to make that finding in light of your agreement? I think 322 requires the court to make an independent evaluation of the propriety of the settlement. It's clear there are cases from the ---- What in the rule itself do you think requires that, again, when there is a separate settlement as opposed to a hearing, where you're correct, if there were a hearing, the court would have to make such a determination. But here, on the eve of the hearing, in order to avoid the hearing, there was a settlement. So what is it? Your Honor, I can only cite to you from Robert a Seventh Circuit decision, Liberty a Supreme Court decision, Newman a Ninth Circuit decision, and Baltram an Eighth Circuit decision where the criminal defendant and his lawyer agreed to a forfeiture. Those were in a plea agreement. The problem here is that the provision in the rule you're relying upon applies to forfeiture of specific property because of its nexus to the crime. In this case, you had a general forfeiture order for money, $15 million, and then you and the government decided to resolve that because of so many illiquid assets to just divide up the assets. Whether there was a nexus to the crime with those particular assets or not. These were all substitute assets acquired by Siegel long before the criminal conspiracy of 1994 started. Right, but you agreed to forfeit them. You agreed to give them up to satisfy the $15 million debt, right? The government was pursuing the forfeiture of specific assets in excess of the $15 million. So they weren't looking for cash. They could have had cash. They had an order. The judgment wasn't for specific property. It was for $15 million. That is correct. And then you settled it. We settled that by the government pursuing a claim for specific assets. As we pointed out, at the trial of this case, the government took the position and made what I think is a binding judicial admission that all these assets belonged to Siegel and not to Near North. So when we came to the time of Siegel trying to settle the matter, had the government not insisted that we accept their version of value or they wouldn't negotiate a settlement. Didn't the settlement agreement indicate that Mr. Siegel had made his own independent evaluations of value and was not relying upon the government's valuations? It did say that. It says that. And we told the court that we were required to accept the government's valuation. And the court knew from the fact we sought on three separate occasions to obtain a release of restrained funds so that Siegel could hire an accountant, an appraiser, and lawyers familiar with forfeiture law. Mr. Siegel, Mr. Joyce, my concern here is that your approach to this settlement would seem to make settlements in such cases impossible. I think they're impossible without the court following its independent duty under 32-2 to make sure that the agreement is fair. You're treating it as if it's a class action settlement. No. No, I'm treating it the way three circuit courts of appeal treat a 32-2 in situations much like this where the defendant and his lawyer agreed to a forfeiture. But the situation is not like this because the three court of appeals cases that you're referring to dealt with the nexus requirement in 32-2. And as Judge Hamilton pointed out, the nexus requirement in that rule only applies if the forfeiture order pertains to specific property. There's a separate sentence dealing with money judgments that does not have that nexus requirement. So the cases that you're relying on are not applicable here because the forfeiture was not of specific property. The forfeiture order did not pertain to specific property. So the district court judge didn't have that obligation under a plain reading of the rule. Well, if you don't, I'm sorry, if you don't believe that 32-2 applies, then I think we have a situation where the settlement is clearly unconscionable. So now you're saying the settlement agreement should be dissipated and we should go back to square one? No, I think the settlement agreement to the extent it transferred $15 million to the government to satisfy the forfeiture is totally appropriate. To the extent the settlement agreement required Siegel to give up all of his assets, which this court knew were his assets. This court presided over the trial, presided over the forfeiture hearing. At both of those occasions, the government told the jury, these assets belong to Siegel. The court knew that. And we cited to government's Exhibit 41, which the court was well aware of. Mr. Joyce, what would happen, what would your position be if the liquidation of the assets turned over to the government had only produced $10 million? Do you think they could come after Mr. Siegel for the other five? If he was representing they were $15 million, yes. Under the settlement agreement. But the Department of Justice's own documents, procedures that deal with resolving forfeiture issues said, number one, you have to use fair market value. Okay, they didn't do that here. Number two, you have to seek a settlement. They didn't do that here. A compromise. But your client, who, as the district court found, and as this court in a prior order indicated, is a sophisticated businessman who was represented by sophisticated counsel. And in the settlement agreement, he agreed and acknowledged that he had conducted his own analysis with respect to the value of all the items. But the district court knew that was absolutely wrong. Mr. Siegel suffered from ADA. He did not have any access to these documents. How can you say that the district court knew that was wrong when your client is a sophisticated businessman? The district court made that specific finding, and this court in one of the prior appeals noted that. There's no question. To put it back on the district court now, I don't know what your basis to do that is. And as you noted, the judge presided over the lengthy trial in this case. He got to see how sophisticated your client is. But what he's ignoring is what the government told the jury. I don't care how sophisticated he is. If the government tells the jury all these assets belong to Siegel, nothing changed that. At the time of the settlement agreement, the judge knew these assets were Siegel's assets. So if they would have followed that, I can't tell if I'm into it. You're over total time, but I'll give you a moment or two for rebuttal. Thank you, Mr. Joyce. Thank you. We'll next hear from Mr. Prendergast for Joyce Siegel. Mm-hmm. May it please the court, Richard Prendergast for Joyce Siegel. This is an appeal from the denial, her appeal. It's a denial from a motion to intervene under 24A, 24B. Why do you think the civil rule applies in light of the provisions under Section 1963 for a criminal forfeiture provision? Could you repeat that question, Judge? You've invoked the civil rule for intervention, Rule 24, correct? Correct. The proceedings here are under 18 U.S.C. 1963, correct? That's correct. Which is a criminal forfeiture proceeding. That's correct. And has specific provisions that say this is the only way a third party can participate in such proceedings, right? I'm not clear that Rule 24 wouldn't apply. Well, what's the best argument for applying it or best authority for applying it to this 1963 criminal provision? Well, because Mrs. Siegel's entire claim here has to do with a civil matter. Mrs. Siegel has never been charged with, suspected of, indicted, convicted of anything. She has a contract with the government. That's the stipulation. But that came about because she came in and asserted her third party rights under the RICO 1963 provision. That's true. That's how she came in. But the argument here is once you're in and you have entered into a stipulation agreement with the government, that is a contract like any other contract. And it's enforceable in a court of competent jurisdiction. And since that stipulation bears this case number and bears this case caption, this is the appropriate case to bring it. We could have filed a declaratory judgment action. In light of 1963I, except as provided in subsection L, no party claiming an interest in property subject to forfeiture under this section may, among other things, intervene in a trial or appeal of a criminal case involving forfeiture or commence an action at law or equity against the United States concerning the validity. That would seem to foreclose what you're proposing you could have done. I don't think that's what that section is about. No? What that section is about is when a third party comes in after the government has sought to forfeit property against a defendant and the third party comes in and says, we have a superior right to that property. Isn't that what's happening here? No. That's what you did, isn't it? Well, no. What's happening here is she entered into an agreement, the meaning of which is somewhat in controversy to say the least. She entered into agreement with the government, and that agreement became an enforceable contract. But she entered that agreement after she came in under subsection L. Yes. And when she came in under subsection L, she then entered into an agreement. That agreement is an independent contract that is enforceable. As I said, she could have filed a declaratory judgment action, and what would have happened in the Northern District is it would have been deemed a related case and it would have been transferred over to Judge Castillo. But it would still be an independent action. Not necessarily. The local rules don't have related criminal civil cases. It may have ended up there, but I'm not sure it definitely would have. Or dismissed under 1963I. I have to say, and I know you have ample experience in the Northern District, I cannot imagine that a case filed and it's assigned to another judge in this particular case for this particular relief would not have been sent back to the judge. It may have made its way back, but not under that particular local rule. But that's a separate issue. Okay. Going to the substance of your agreement, what's your position on whether or not the forfeiture proceedings before the district court judge are over? Thank you for that question. They're over if $15 million of Michael Siegel's. I'm sorry, I didn't hear you. They are over if $15 million of Michael Siegel's assets have been forfeited. That's the issue. If that's happened, they're over. There's no question the government isn't entitled to one penny more. Actually, there is a question about that. Right? There was a settlement. There's a debt to pay $15 million, right? That's correct. And a settlement that says we've got a lot of illiquid assets. We don't want to fight anymore about valuation. You take these, we'll take those, and we go our separate ways. Right? Yes. And when it's all over, if there's anything left when the government's completely done, then your client may be able to assert some rights in some form. The government's entitled to $15 million of forfeiture. This court sent Michael Siegel's case back to the district court when there was a $30 million forfeiture and said review it on the grounds that this court directed. The court did so and said the forfeiture is $15 million. That's part of his sentence. You can't add a day to a sentence in jail and you can't add a dollar to a sentence. Can you have a settlement? We can reach a settlement, and that settlement was based on the premise that there was a $15 million. So let me ask the same question that I asked Mr. Joyce. What happens to your client's position if the government liquidates those assets, says we've only got $10 million, we want $5 million more from Michael and Joy? I don't know what happens in those circumstances, Your Honor. I think that would be up to the figures. I can predict. I really don't know what would happen, but I can tell you that hypothetical is not this case. Let me just put this in what I believe to be the right posture. This is an appeal from an order that did not permit us to intervene. We satisfied all of the requirements, the four requirements of 24A. The order is I will not allow you to intervene. Now consider what that means. That means that we are precluded from participating at all. The right to intervene was established, interestingly, not in the district court when we presented this motion or in this court, if you read the government's brief, does the government say one word about that? The government does not at any time here contest her right to intervene. Mr. Petermans, is there any forfeited property here to which the government has not asserted a claim or has otherwise been released? I don't know the full range of all the forfeited property, Your Honor. I can't get into the case to find out. But have you asked them if there's any forfeited property to which they have not asserted a claim? Actually, Your Honor, and it's in the record, I did write a letter the first time we were sent packing to Mr. Hogan and asked him to address the very issue you're raising and several other issues that he had represented were the case when he appeared before the district court. I never got an answer to that letter. I never got any information. Judge, Mrs. Siegel has been knocking at the courthouse door to get her money back. Excuse me, but didn't she file a claim under 1963L2? She did. That's the process, right? And the door opened and you negotiated a settlement with the government, right? And she negotiated a settlement with the government. Right. So what are you complaining about? No, now what's the construction of that settlement? The government is not entitled to a nickel more than $15 million. If the government has already obtained $15 million, they cannot use Joyce Siegel's assets any further. Is there anything in the settlement agreement that your client entered with the government that says that? Not the $15 million. That's a pretty big step. You're saying that the settlement agreement that Mr. Siegel entered with the government only allows for $15 million to be forfeited, and therefore after that Mrs. Siegel can come back in and try to obtain it. But where in your settlement agreement does it say that? It doesn't. The settlement agreement doesn't use the word $15 million, but it does talk about at the end of the forfeiture proceedings. And you asked the right question, I believe, when I first stepped up here. Has that occurred? We go to court and we say, if you've collected $15 million, the forfeiture is over with, and the judge says, I will not let you win this case to find out. Well, under the settlement agreement, I think the right question is the other one. Is there any forfeited property to which the U.S. has not asserted a claim or has otherwise been released? Because that's the only hook in paragraph 15 of the settlement agreement that would give your client any rights here. I think, Your Honor, you have to read asserted a claim to mean asserted a valid claim. Asserted a valid claim, and I would challenge the validity of some of the government's claims. If the enforceability of a settlement agreement depends upon deciding the validity of the claims that are being settled or being resolved by that, we all ought to go out of the settlement business, right? It's not going to work. You settle to deal with disputed claims. Your Honor, I only represent Joyce Siegel. Joyce Siegel has parted with money, in our view, and what our complaint says, our proposed complaint, which is attached to our motion to intervene says, is that when the government gets to $15 million, forfeiture is over with, and if you've been able to satisfy that $15 million by using the assets of Mr. Siegel, you have to give hers back. They were just parked there in case they were needed in order to get to $15 million. I think if we were allowed to come into the case, and I want to make it very clear that the scope of the appeal here for Ms. Siegel is whether or not she should have been allowed to come in. She should have been allowed to intervene. I think we have your position, counsel. If there are no further questions, you'll have a moment or two for rebuttal. Thank you, Judge. Thank you. Mr. Hogan for the government. May it please the Court. William Hogan on behalf of the United States. First, I'd like to address the jurisdictional aspects that the Court inquired of regarding Mr. Joyce's case. The Court is familiar with the background. I'm not going to belabor that, but the Court remanded this case once in 2007 when the forfeiture judgment by the jury was $30 million. Two years of solid litigation ensued before Judge Castillo, during which there were dozens of briefs filed by both parties that identified all of the assets that had been restrained by the court orders, including assets by Near North, which had been purchased with corporate funds and held in corporate title, and Mr. Siegel's assets. Mr. Siegel, for many, many years, during the course of his operation of the business, had used Near North funds to purchase assets that he either put in his own name or in the corporation's name. The corporation was ordered forfeit in June of 2004, and there was a forfeiture order entered immediately after Mr. Siegel's conviction, forfeiting the entirety of the enterprise. That meant not just the Near North insurance business, but all of the assets that had been purchased with corporate funds. That included 20-some subsidiaries and other assets such as, for example, the Chicago Bulls and the Chicago White Sox, and interests in the United Center and various restaurants and various apartment buildings and some other things. All of those latter assets were part of the corporate forfeiture, the enterprise forfeiture, which is extremely important to keep in mind as a predicate going forward in this case, all the way from 2007. In 2009, after multiple years, literally a briefing before the district court, and a submission of all kinds of schedules and all kinds of analyses of these corporate assets and the personal assets, Judge Castillo reduced the original $30 million personal judgment against Mr. Siegel to $15 million. The corporate asset judgment, the corporate enterprise forfeiture, was not an issue in that process. After that judgment was entered in 2009, there was a settlement agreement that was entered with Joy Siegel. She has, as the court has already observed, appropriately filed her third-party claim, and I believe it was January of 2006 when she was represented by Joseph Duffy of another law firm in town, not Mr. Prendergast or his predecessor, Mr. Seiden. But Mr. Duffy then engaged in several years of negotiation with the government on behalf of Joy Siegel regarding her third-party claims. That was prolonged until 2010, largely because during that period of time the original forfeiture judgment was on appeal to this court, and there was litigation ongoing in the district court after the remand, and so the amount of that forfeiture judgment, the $30 million, was still up for grabs at that stage. And during that period, because Mr. Siegel's counsel thought that they had a shot at reducing the $30 million, there was an order entered at their request in the district court staying the forfeiture proceedings regarding other claimants, for example, particularly in this case with regard to Mrs. Siegel. So it wasn't until the district court reduced the amount of forfeiture to $15 million in 2009 that Mrs. Siegel reached a forfeiture agreement with the government in 2010. In that case, she was presented with the following option. She could choose any assets that she wanted up to a dollar figure of $7.7 million, which she did. The title for those assets was irrelevant. In other words, if they were owned by the corporation, if they were owned by Mr. Siegel, if they were owned by her, it didn't matter. What she did was take an amalgamation, column A, column B, column C. For example, $2 million of jewelry that she had personally owned, she took. She took title to a condominium on Lakeshore Drive worth about $3 million, the title of which was in Mike Siegel's name only. And she took a variety of other things, including a condominium in Florida where her parents had lived, but was also titled in Mike Siegel's name only. So in that process, represented by extremely competent counsel, who's very familiar with the racketeering laws, Mr. Duffy, she took $7.7 million worth of assets and bowed out of the case and resolved all of her claims and specifically renounced any claim to any other asset in the entire proceeding going forward with one small proviso. And her settlement agreement has three different paragraphs. I believe it's paragraph 12, paragraph 13, and paragraph 15. Explicit language renouncing any and all claims to any and all property that's been restrained by the district court's orders. And by that point, in 2010, there were four forfeiture orders that had been entered by the district court after conviction, at sentencing, again in December of 2005, and again in 2010 or 2009 when Judge Castillo entered another reduction from the $30 to $15 million. And Mr. Hogan, is there any of that forfeited property to which the government has not asserted a claim or has released? No. The answer to that is no. And here's why. And this gets to the settlement with Mike Siegel, which comes another three years later than, 2013. But in between, after Judge Castillo reduced the amount from $30 to $15 million, there were another round of appeals to this court, as the court recalls. And the court then, both sides again, appealed the second forfeiture order, the reduction to the $15 million. This court affirmed Judge Castillo's decision in May of 2011. In March of 2012, cert was denied in that. At that point, the forfeiture judgment, the $15 million, was a final order. And that was no longer appealable. That is the order that Mr. Siegel then, through his counsel Mike Cherry, and then through Mr. Joyce, in 2016, sought to, quote, modify. Now, he says now, after lots of litigation in the district court, that he wasn't really trying to modify the judgment order, he was just trying to deal with the settlement agreement. Well, that's all well and good, and that's what district court, Castillo, in fact, found in his opinion in 2017. Not found, but treated it as in 2017. But in the interim period, after this court affirmed Mr. Siegel's $15 million forfeiture in 2011, and the Supreme Court denied cert, Mr. Siegel was resentenced in May of 2016 and released early, about six months early, for time served by Judge Castillo. At which point, now we had the situation where we had to figure out how to fund the $15 million judgment. Some of the assets were liquid. Some of them were cash. Some of them were marketable securities. Many of them were illiquid, limited partnerships or apartment buildings or restaurants and things of that nature, sports franchises and things of that nature. So there was this forfeiture hearing scheduled for the purpose of allocating the assets between Mike Siegel and the government, and the government being Near North, because Near North, having purchased many of those assets with its funds, had a claim to more than half of the pool of assets. The pool of assets was roughly $45 million. And the government had, in the proceedings back in 2007, 2008, 2009, submitted to the district court schedules that identified who owned that various property. And the provenance of a lot of those assets was a little bit hard to determine because many of them had been purchased back in the 80s, in the early 90s, and things of that nature. And so the government came up with a very clean and easy way to sort of cut that Gordian knot and to figure out who was the actual owner of the property and had the best title. And we did that by looking at the corporate tax returns by Near North and Mike Siegel's tax returns that had been introduced at the trial back in 2004. And if Mike Siegel claimed those assets on his tax returns and received K-1s for them, then we considered them to be his assets. If, on the other hand, they appeared on Near North's tax returns and Near North had received K-1s for them, or they were listed in Near North's corporate books and records as having been property owned by the corporation, we considered them Near North's assets. And then we prepared for a forfeiture hearing that was scheduled in the district court for February of 2013. What was the value of the assets at that time that you were attributing to Mr. Siegel? Well, Mr. Joyce's brief has argued on different occasions. That's why I'm asking. The answer to your question is about $12.5 million. And the reason that there is a differential in an earlier figure, and that is the figure in 2009. The figure in 2009 was about $16 million. The reason that there's a reduction to about $12.5 million is because in that interim period we settled with Joyce Siegel and we gave her $7.5 million, including a $3 million condo that had been listed as Mike Siegel property in 2009 and a couple of million dollars of other things, such as assets at Merrill Lynch, retirement funds, ERISA funds, things of that nature, bank accounts, all of which were listed as Mike Siegel's sole property in the 2009 proceedings because that's the way they were titled on his tax returns. And so the diminishment from about $16 million roughly of Mike Siegel assets in 2009 to about $12.5 or so in 2013 is because of the settlement with Joyce Siegel. So what we did in the 2013 period was update those asset schedules, provide them to Mr. Joyce and Ms. Doherty and Mr. Mark Martin, who was their counsel at the time, and a very experienced criminal practitioner who's appeared before this court on numerous occasions in very sophisticated criminal matters, including forfeiture matters. And the three of them analyzed those schedules, and we had a series of meetings in January of 2013, which resulted in this settlement agreement that was reached days before the forfeiture trial. Now, at the forfeiture trial, the government was prepared to prove ownership by Near North. I don't know. You settled it, right? We settled it. Okay. But the settlement, the point is that the settlement was not just settling $15 million for Mike Siegel. That was a component of the settlement. The settlement agreement says specifically in the earliest paragraphs of the agreement that the property is to resolve claims to assets between Mike Siegel and Near North specifically. That's in paragraph 6 of the settlement agreement. So it's not just we're taking this property to settle Mike Siegel's $15 million. It's we have this pool of property that's worth about $45 million, some liquid, some illiquid, some sports franchises, some restaurants, some other things, and we're going to whack it up between Near North and Mike Siegel. And if Mike Siegel- With the government standing in the shoes of Near North. Yes. The government owns the property, owns the enterprise precisely. What's left in the district court? Well, I would say nothing as far as Mike Siegel because of the argument that we made in our briefing as the court inquired of Mr. Joyce already, that there's nothing to appeal. He doesn't have, there is no final order. I'm trying to think how to phrase this accurately. He's not got an order that's properly appealable in this court. There is no jurisdiction. If you take the appeal from the judgment order, that was final in 2012, the timeliness aspect, the court's already inquired about under Rule 4B. My problem, Mr. Hogan, I was trying to figure out what the district court, what jurisdiction the district court had to be dealing with these issues. And I think the answer is under the retention of jurisdiction provisions that are in both settlements. They are. The last paragraph of Paul Shepard's- And so Judge Castillo agreed to live with you guys for a few more years under those settlements. And so we have, he has, in essence, it might be useful to think of it as administering an estate. That's clearly, I think that's true with regard to Mr. Siegel. I don't think it's true with regard to Mrs. Siegel, and I'll get to that distinction. I argued in the district court, as the court's seen in our briefs in the district court, which is docket number 2088 in this proceeding that's been going on for 15 years. We argued that there wasn't any jurisdiction, and we argued collateral estoppel, and we argued judicial estoppel, which, by the way, Judge Castillo found again, because the settlement agreement's been enforced for years in the district court, as well as on three separate appeals from the settlement agreement in this court back in 2016, and by the same lawyers who are attacking it now, by the way. And in those appeals, the notices of appeal were filed within the time limits of 4B. They were. That is, under the criminals, and I'm still confused as to why we're under people trying to use the civil court. Well, I don't think we should be. Well, on that point, and you've made your point in your brief, but I guess the argument, as I see it from the other side, is this certainly feels like a civil dispute at this point under a contract. It's a contract. It's a settlement being administered by the district court. There's plenty of law that tries to parse that out, and the court's already alluded to a couple of them. Lilly, I believe, and the cases that the defendant relied on, Beltran and Newman, I think, is another one. Those dealt with either third party. Those two latter ones are a different issue, I apologize. That's on the nexus issue. What about Lee that does address this? I don't see Lee cited in their brief. I don't know anything about Lee. I've never heard of Lee before this morning. I can tell you that there are cases to try and parse out the difference between the civil and criminal timing for appeals, and they break down over the distinction between third party claimants and defendants. There's a case called Levin. What Lee says, Mr. Hokett, is that the court should look to the substance and context of the underlying proceeding. There's a case called Levin, L-E-V-I-N, that I recall, and I don't know if it's the Fourth Circuit or the Ninth Circuit. I know that it's a case that I believe that you submitted. I know that I'm familiar with, and I can get you to cite it if it's not cited in our brief. In that regard, that dealt with a third party claimant who came in and asserted a right to property of a criminal defendant. In that, the government argued, no, they're barred by Rule 4B because they didn't file it timely. I think back then it was 10 days as opposed to the 14 days now. And the court said, no, we're going to agree with the third party claimant in this because it's more in the nature of a civil proceeding because they are not the defendant. And that's the distinction that I would break here. So you think in determining whether it's criminal or civil, in looking at the substance of it, the determining factor is whether or not the defendant is pursuing it as opposed to a third party?  Yes, and it's not in my brief that I realized after I filed it most recently, actually. It's part of Rule 32.2. It's actually 32.2C. I'm sorry, 32.2B1C, time to appeal. And it says, the time for the defendant or the government to file an appeal from a forfeiture order or from a court's failure to enter an order begins to run when judgment is entered. And this is the important part that I bring to the court's attention. If the court later amends or declines to amend a forfeiture order to include additional property, the defendant or the government may file an appeal regarding that property under federal rule of appellate procedure 4B. That's what I think also applies in this case and what restricts the applicable time period for Mr. Joyce in this case to the 4B time period. If I could turn to a couple of other issues. Before you do that, Mr. Hogan, could I ask you how much has the government actually realized so far from the assets covered by the 2013 settlement agreement with Mr. Siegel? The pool of assets in 2013 was roughly $47 million. And Mike Siegel has had his $15 million satisfied out of that. In other words, we considered it satisfied. And we gave him back another $8.5 million. So roughly in the $35 million range is on hand maybe a little bit more. Sorry, let me try to... Okay, sorry, go ahead. I would say between $35 and $40 million. Some of it the government has in an asset fund, Marshall C's fund, like, for example, if we sell a restaurant that Near North owned, or some of it the trustee has in his fund from winding down the business. I just want to make sure I understand what you said. The $35 to $40 million figure, that's the amount that the government still has. That does not include the settlement amount, correct? The settlement amount is included in that, yes. So that would take out the $8.5 million? It takes out all of Mr. Siegel's money, including the $15 million. So how much is it that the government has recovered or forfeited at this point that you haven't given back? Given back? Pursuant to settlement. I'm not quite sure how to answer that. What's the figure of what the government has forfeited? Well, the total figure that the government forfeited was in the $47 million range. We gave Joyce Siegel $7.5 million, we gave Mike Siegel $8.5 million, and we have the balance. So about $30-something million that was owned by Near North. And that represents both Near North and Mr. Siegel's applications? Yes. And that's the problem, it's untangling those two. Well, it's not untangling it because he waived his rights to all that. But it would have been the problem if you'd gone to that hearing. Yes, which we were perfectly prepared to do. We were totally geared up. I mean, we flew in witnesses from Finland and Hawaii and everywhere else. We called the district court at 6 o'clock on Friday night saying, you know, call it off, we were all ready to go. With respect to Joyce Siegel, once again, Joyce Siegel, I've already alluded to, came in in 2006, filed her claim, was represented by a competent counsel through 2010, settled her claim in 2010 by taking property that's listed in our brief, in our appendix, in the first couple of pages of our appendix, actually it has schedules A and B of Joyce Siegel's property that she was given back by the government. I think schedule B is $2 million worth of jewelry. Schedule A is a bunch of bank accounts and a bunch of other things, including the property in Florida and Chicago. And she waived anything else in her settlement agreement. There is that provision, Mr. Hogan, there is the provision in the agreement that allows her to come back in to claim property that the U.S. has not asserted a claim to or that has been released. How is she supposed to find out if that happens? Because we are, as I've explained to the district court, as in all the transcripts that are appended to the briefs in this case, we're filing with the district court every single time we sell an asset turnover order or a liquidation order or whatever. At the conclusion of the proceedings, there are still creditor's claims out there which the trustee and his law firm are getting ready to settle and pay and have made provisions for, including tax payments that are due by the corporation still that have been delayed all these years because of this ongoing, never-ending litigation. We're prepared to submit all that information to the district court, either the trustee through his outside counsel or the government personally. And at that point, there's going to be, I don't know if you want to call it a final reconciliation, but there's certainly going to be a final court order entered that's going to be a final judgment, a final forfeiture order. So you expect at some point the district court to enter a final forfeiture order? Yes. And I've said to the district court many times, it's in the transcripts that I've already alluded to that are part of the briefs in this case, the appendices in this case. I do not expect there will be anything left over that the government does not have a certain claim to. It's either part of the enterprise forfeiture or it's part of the corporate liquidation that's, you know, part of Near North's liquidation. Would that include for creditors as well? I'm sorry? Would that include what you think the creditors may have access to? You said there won't be anything? We will pay all the creditors, including all the tax obligations that are out there through corporate funds. Yes. And Joyce Siegel, as Judge Castillo has found over and over, I mean this is the sixth lawyer who represented Joyce Siegel, Mr. Prendergast. Joyce Siegel tried four times, including twice by Mr. Prendergast, to intervene and to reopen the settlement agreement. Mr. Seiden tried it in 2013 after Mike Siegel's agreement. And Mr. Seiden tried it again in 2014 and was denied and told to come back because we hadn't finished the forfeiture proceedings. And that clause that you referred to, Judge Staineve, in paragraph 15 of her agreement that says that she has the right to come back in if and when there's nothing left at the end of the proceedings and assert a claim to anything that the government abandons, that has not occurred yet. And it's your position that that will occur when there's a final order entered? If there's anything left, yes. Yes. And they'll be able to determine that. But Judge Castillo has already said over and over on the record, what are you here for? There's nothing left. There's not going to be anything left. Is she still getting served? Yes, absolutely. She's part of the services. Under the original 1963L contract. Yes. She's part of the services and she's getting noticed. As I've said many times to Judge Castillo and as is evident by what's going on here today. And again, I don't think that Joyce Siegel has any rights to be here from a jurisdictional standpoint either. There is simply no civil right for a claimant to intervene under Rule 24, Civil Procedure Rule 24. This is a criminal proceeding. It's governed exclusively by 1963. The case law makes that absolutely plain. There's a case called McCann that's cited in our brief that says this is the exclusive way. The Supreme Court has basically said that in Liberty and a number of other cases. Infelice in this circuit says the same thing. If you are a third-party claimant under the Fort Fisher statute, I believe it's 1963I, it says that you have one way to intervene and to present your claim and that's to file a third-party claim and have it adjudicated. With regard to the other Rule 32 arguments that Mr. Joyce raised regarding the nexus argument, once again, this is a money judgment. There was no obligation by the district court to assess the valuation of the assets that were part of the settlement agreement. Nonetheless, the district court did in the litigation back in 2007 through 2009 have great familiarity with all of those assets and their valuations. The settlement agreement that was reached in 2013 had valuations for all the assets listed on the schedules that are appended to the settlement agreement. Also contained in our appendix here, they each had a dollar figure. The district court properly found in this case in his 2017 opinion that Mr. Joyce and Mr. Martin and Ms. Doherty as representatives of Mr. Siegel had ample opportunity in preparation for the settlement for the forfeiture hearing that was scheduled for February 2013 to come in and look through all those documents. They were all made available to them. The district court specifically relied upon two lengthy affidavits to contain those schedules. They were appended to government briefs. Those schedules were originally appended to the government's briefs in June 2009. So this information has been available to defense counsel throughout the process. And with regard to the argument that, oh, well, he didn't have enough money to hire lawyers and accountants or appraisers, Mr. Joyce, Ms. Doherty, and Mr. Martin have been representing Mr. Siegel since 2004. They never complained about an inability to access information or documents. They never complained that they had been forced to take some kind of settlement ram down their throat. Even during the post-settlement litigation that lasted for so long, the first time they made that argument was in the appeals to this court from the settlement agreement. Anything further, Mr. Hogan? I'm sorry? Is there anything further? Nothing, Your Honor. All right. Thank you very much. Thank you. How much time did Mr. Joyce have? Take one moment for rebuttal, Mr. Joyce. And then same for Mr. Prendergast. Your Honor, could I have just maybe two minutes? Just proceed. Okay. Your Honor, I apologize. You're correct. Lee was not cited in our brief. I don't know how we missed doing that. We should have written a 20HA letter. We will write a 20HA letter. If we don't prevail on the timeliness of the appeal aspect, well, then we're done. But the government never really, in their appellate brief, dealt with the issue of ownership. All the arguments you heard today from Mr. Hogan about ownership are not in their appellate briefs. And the reason they're not in their appellate briefs is very simple, because pursuant to Exhibit 41, they told the jury they're all Siegel's assets. That's why they didn't put them in their appellate brief. And the notion that Judge Castillo should just sit by, I think, is really debunked by Newman, a Ninth Circuit decision, where it says, quote, we do not mean to suggest that a district court must simply accept a defendant's agreement to forfeit property, particularly where that agreement is not accompanied by a stipulation of X supporting forfeiture. Newman is a nexus. I don't think Newman's applicable here. It's a nexus argument. Anything further? No. Thank you, Mr. Joyce. Mr. Prendergast? With respect to the civil criminal issue, there's a case called United States v. Piccioni. It's a Second Circuit 1991 decision, 948 F. 851, in which precisely the argument was made here. And there had been a letter of agreement entered into to settle forfeiture issues in lieu of a formal RICO forfeiture. The Second Circuit reversed the district court's refusal to entertain the claim because of the provisions of the RICO statute and held, quote, the government has advanced no plausible argument and, consequently, has not persuaded us that the agreement should be treated any differently from any other agreement entered into by the government. We have every right to be here and to enforce that settlement agreement. Was that case before Rule 32.2 was in place? Your Honor, it's a 1991 case. I don't know when that provision was. I think 32.2 came into effect, I think, in 2000. I don't believe that would make any difference to the holding in that case that there is no plausible reason not to allow a party. I mean, what it appears to be doing is allowing the government to get into an agreement but not have to live with it. And I can't understand how an agreement would be entered into in connection with a proceeding, forfeiture proceeding, and then the government doesn't have to live with it. Or that you simply use criminal procedures. I beg your pardon? Or that you enforce it but you use criminal procedures in the District Court and in the Court of Appeals. Well, I think as long as you're talking about enforcing an agreement, it doesn't make any difference whether we get in on a civil rule or coming in in some other fashion. I mean, we were there. If I could just touch on two points that were raised by Mr. Hogan. We've been trying to reopen this settlement. Joy Siegel hasn't tried to reopen this settlement. She's tried to enforce it. The problem is she can't get in the door. Anything further? Yes, one thing. The reason for this appeal is to review the denial of a motion to intervene. We understand. There is nothing in the report. Is there anything else? Is there nothing? Thank you, Counselor. The cases are taken under advisement. We'll proceed to the next appeal of the day. Thank you.